UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STANDARD INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | 20 C 2084 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| JUSTIN VANLANDUIT, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this diversity suit against Justin VanLanduit, Standard Insurance Company seeks, alternatively, (1) a declaration that his disability income insurance policy is void *ab initio* due to his failure to satisfy conditions precedent to coverage, (2) rescission of the policy due to the misstatements he made in his policy application materials, or (3) a declaration that the policy does not cover his disability claim. Doc. 1. VanLanduit's counterclaims allege that Standard wrongfully denied him disability benefits and breached its duty of good faith and fair dealing. Doc. 13. On the parties' joint motion, the court bifurcated Standard's claims from VanLanduit's counterclaims, ordering Standard's claims to proceed first. Doc. 26.

With discovery closed, the parties cross-move for summary judgment on Standard's claims. Docs. 31, 34. Standard's motion is denied, while VanLanduit's motion is granted as to Standard's void *ab initio* claim and denied as to its rescission and coverage claims.

**Background**

Because the parties cross-move for summary judgment, the court must consider the facts in the light most favorable to VanLanduit when considering Standard's motion and in the light most favorable to Standard when considering VanLanduit's motion. *See First State Bank of*

*Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). When a disputed fact relates to both motions, the court will set forth the parties' respective positions on that fact. At this juncture, the court does not vouch for either side's version of the facts. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

### A.    VanLanduit's Application for a Disability Income Insurance Policy

On October 24, 2012, VanLanduit—then employed as a golf course superintendent—signed and submitted an application to obtain a disability income insurance policy from Standard. Doc. 38 at ¶ 3; Doc. 35-1 at 36-41. The application required VanLanduit to answer the following questions about his medical history:

1. In the last 10 years have you had, been told you had, been treated or seen by a medical practitioner for, or been diagnosed as having: … Back or neck pain or disc problems; spinal sprain or strain; sciatica, arthritis, or carpal tunnel syndrome; or any other disease, disorder or injury of the bones, joints, nerves or muscles?

2. Other than as stated in other answers, have you within the last 5 years: … Been hospitalized or been seen by a physician, chiropractor, counselor, psychiatrist, therapist or other medical practitioner?

3. Other than as stated in other answers, have you within the last 5 years: … Had an EKG or blood test; sleep study or other medical procedure, study or test?

4. Other than as stated in other answers, have you within the last 5 years: … Been advised to have any medical test, surgery or hospitalization that was not completed?

5. In the last 3 years have you had any physical or mental condition or symptom that has not been treated or diagnosed?

Doc. 35-1 at 39-40; Doc. 38 at ¶¶ 4, 6-9. VanLanduit answered "no" to all but the first question. Doc. 35-1 at 39-40; Doc. 38 at ¶¶ 4-9. He answered the first question "yes," noting that he had a "strained muscle in [his] lower back" in June 2012 for which a physician, Dr. Brian Waxman, prescribed a pain killer for one week. Doc. 35-1 at 39; Doc. 38 at ¶¶ 4-5; Doc. 40 at p. 4, ¶ 14.

In another part of the application, VanLanduit disclosed Dr. George Elvove as his primary care physician. Doc. 40 at p. 12, ¶ 30.

VanLanduit made several representations in signing the application, three of which are pertinent here. First, he agreed that if Standard issued him a disability income insurance policy, the application, along with any amendments and supplements, would "become part of the policy issued by Standard." Doc. 35-1 at 41; Doc. 38 at ¶ 10. Second, he acknowledged that "[n]o [i]nsurance will be in force until: (a) the date a policy has been issued, delivered to and accepted by the owner; and (b) the first full premium is paid while all answers in this application remain true and complete." *Ibid*. Third, he represented that "[a]ll answers in this application are true and complete and correctly recorded," and "that if any answers are false, [i]ncorrect or untrue, Standard may have the right to deny benefits or rescind [his] insurance policy." *Ibid*.

The following notice, which the court will call the "fraud notice," appears immediately above the signature line on VanLanduit's application: "NOTE: A person commits a fraudulent act when that person knowingly files an application for [i]nsurance which either contains materially false information or conceals material information with intent to mislead." Doc. 35-1 at 41; Doc. 38 at ¶ 11.

### B.     VanLanduit's Medical Evaluation and Testing for a Muscular Disorder

On December 12, 2012, while VanLanduit's application was pending with Standard, Dr. Anthony Romeo, an orthopedic surgeon, examined him for a shoulder abnormality first noticed by his physical therapist. Doc. 38 at ¶¶ 13-15; Doc. 40 at p. 5, ¶ 18. Dr. Romeo took x-rays of the shoulder region, and determined that VanLanduit's "limited facial muscle use" and "bilateral severe scapular winging"—a condition where the patient's shoulder blades protrude outward like a pair of angel wings—"raise[d] the concern" that he had facioscapulohumeral muscular dystrophy ("FSHD"), a genetic muscular disease. Doc. 38 at ¶ 14. Dr. Romeo "discussed [with

3

VanLanduit] the possibility of him having a type of muscular dystrophy" and "instructed him that he need[ed] to have genetic testing in order to confirm the diagnosis." *Ibid.* Dr. Romeo referred him to a neurologist, Dr. Alexandru C. Barboi, for further evaluation. *Id.* at ¶ 16.

Dr. Barboi evaluated VanLanduit on December 20 and performed electromyography ("EMG") and nerve conduction study ("NCS") testing. *Id.* at ¶ 17; Doc. 40 at p. 6, ¶ 19. Based on results "show[ing] evidence for a chronic [muscular disorder]" and the fact that VanLanduit presented with a "FSHD phenotype," Dr. Barboi "discussed [with him] disease, prognosis[,] and possible worsening over time." *Id.* at ¶ 23. As a next step, Dr. Barboi ordered a genetic diagnostic test for FSHD. *Id.* at ¶ 24. VanLanduit had blood drawn for that test on January 10, 2013. *Id.* at ¶ 25. On February 15, Dr. Barboi advised VanLanduit that the test showed a "borderline FSHD1 result, but given his phenotype this is likely significant." *Id.* at ¶ 27.

### C. Standard's Investigation and Approval of VanLanduit's Application

In the meantime, as part of the underwriting process for VanLanduit's application, Standard requested and obtained medical records from Drs. Elvove and Waxman, the two physicians identified on the application. Doc. 40 at p. 13, ¶ 33. Dr. Waxman's records described the treatment VanLanduit sought for the lower back pain referenced in the application. *Id.* at pp. 4, 14, ¶¶ 14, 34. Dr. Elvove's records described treatment for pain in VanLanduit's right shoulder, which was not referenced in the application. *Id.* at pp. 14, 17, ¶¶ 35, 40. Standard did not obtain any records regarding the treatment VanLanduit received from Drs. Romeo and Barboi or their concern that he had FSHD. Doc. 38 at ¶ 47; Doc. 40 at p. 14, ¶ 34.

On December 27, 2012, after Dr. Barboi's evaluation but before VanLanduit had his blood drawn, Standard wrote to VanLanduit informing him that his application was "approved" with two modifications "based on information received during [the] underwriting process." Doc. 35-10 at 2; Doc. 40 at p. 15, ¶ 37. The modifications effected two coverage exclusions—

4

one for disability caused by injury to, disease, or disorder of the lower back, and the other for

disability caused by injury to, disease, or disorder of the right shoulder. Doc. 40 at pp. 16-17,

¶¶ 38-39. Standard explained the basis for the exclusions as follows: "The reason for our

decision and source of information is: Medical records information received from Drs. Waxman

and El[v]ove with treatment to the lower back and the right shoulder." Doc. 35-10 at 2; Doc. 38

at ¶ 49; Doc. 40 at p. 15, ¶ 37.

### D. VanLanduit's Supplement and Amendment to His Application

On January 14, 2013, VanLanduit signed a "supplement" and an "amendment" to his

policy application, each of which contained the fraud notice. Doc. 38 at pp. 11-14, ¶¶ 28-36;

Doc. 35-1 at 46 (amendment); Doc. 35-1 at 48 (supplement). In signing the supplement,

VanLanduit certified that he "underst[ood] and agree[d]" that:

1. I have read the questions and answers in the application for insurance (including any application supplement) which is attached to the policy and all answers recorded in the application are true and complete as of the date of the application. …

2. *Since the date of the application, I have not: (1) consulted with or been treated by a physician or other medical practitioner, other than to comply with Standard's underwriting requirements*; (2) experienced any sickness, injury or change in health; or (3) changed occupation or employer. *I understand that if any of this information has changed since the date of the application, I should notify the sales producer of the change(s) and should not sign this form and not accept delivery of the policy*.

3. Coverage will not take effect under the policy unless this form is signed by me and the policyowner, if different, the first full premium is paid, and there has been no change in my health and status of employment or occupation as stated in the application.

Doc. 35-1 at 48 (emphasis added). VanLanduit made similar certifications in signing the

amendment. *Id*. at 46 (certifying that he had read the questions and answers in the application,

supplement, and amendment, that "[a]ll answers recorded in the application and in this

amendment remain true and complete as of the date this form is signed," that "*there has been no*

*change in the information provided in the application, except those amendment(s) specifically*

5

*listed above*," and that "[c]overage will not take effect under the policy unless this form is signed by me[,] … the first full premium is paid, and there are no amendments in the answers I have provided in the application other than those listed above") (emphasis added).

Despite these certifications, in neither the supplement nor the amendment did VanLanduit disclose the treatment and tests he had undergone after filing his original application—specifically, Dr. Romeo's evaluation on December 12, 2012; Dr. Barboi's evaluation and the EMG and NCS testing on December 20, 2012; and the diagnostic blood test on January 10, 2013. Doc. 38 at ¶ 44. At his deposition, VanLanduit admitted that the medical history information provided in his original application was no longer accurate by the time he signed the amendment and supplement. Doc. 32-4 at 16-18 (58:9-69:19). VanLanduit testified, however, that he did not believe that he was "concealing information from Standard." *Id.* at 27 (105:14-17). The reason, he explained, was that when he signed the amendment and supplement, he believed that Standard already "had access to [his] medical records" and thus was "aware of what was going on [with his treatment by Drs. Romeo and Barboi]"—whom he had seen "for a shoulder problem"—"and that's why the exclusion for the shoulder was put in." *Id.* at 16 (61:10-24). That is, according to VanLanduit, because he did not mention any shoulder problems in his original application, he believed that Standard had imposed the shoulder exclusion upon learning of his treatment by Drs. Romeo and Barboi. *Id.* at 10, 17 (34:14-35:14, 63:5-64:5).

Standard disputes VanLanduit's submission that, when he signed the amendment and supplement, he genuinely believed that Standard had imposed the shoulder exclusion because it knew about his recent treatment by Drs. Romeo and Barboi. Doc. 40 at pp. 18-21, 30, ¶¶ 43, 45, 58. Standard further asserts that VanLanduit's beliefs as to what it knew are irrelevant, given that he "had an obligation to completely and accurately disclose information in the application

6

materials." *Id*. at p. 18, ¶ 43. Standard's relevance objection is overruled because—as explained below—whether VanLanduit intended to deceive Standard is central to the question whether it may rescind the policy or deny coverage for allegedly fraudulent misstatements he made as part of his application.

### E. Standard's Issuance of the Policy

After receiving VanLanduit's amendment and supplement, Standard issued him a disability income insurance policy effective January 14, 2013. *Id*. at p. 22, ¶ 46. VanLanduit paid the first premium on January 16. Doc. 38 at ¶ 60. The policy requires Standard to provide monthly benefits payments to VanLanduit if he becomes "Totally Disabled." Doc. 35-1 at 8; Doc. 40 at p. 22, ¶ 47. Three points about the policy are pertinent here.

First, the policy defines "Total Disability/Totally Disabled" to mean that, "due to [VanLanduit's] Injury or Sickness … [he is] unable to perform the Substantial and Material Duties of [his] Own Occupation." Doc. 35-1 at 8; Doc. 38 at ¶ 63. "Sickness," in turn, "means an illness or disease which first manifests itself after the Policy Effective Date and while this policy is in force." Doc. 35-1 at 29; Doc. 38 at ¶ 65.

Second, the policy includes this "Pre-existing Conditions" provision:

> Benefits for a Disability caused by or resulting from a Pre-existing Condition will be payable only if the Pre-existing Condition is fully disclosed in the application and it is not specifically excluded from coverage by amendment or endorsement.

> Pre-existing Condition means any mental or physical condition for which, during the 365 days immediately prior to the Policy Effective Date:

> - You have received medical treatment or services; or
> - You have undergone diagnostic procedures; or
> - A clear, distinct symptom or symptoms occurred which, in the opinion of a legally qualified physician, would indicate that the condition existed; or
> - A reasonably prudent person would have sought medical advice, care or treatment.

Doc. 35-1 at 16-17; Doc. 38 at ¶ 67.  This provision purports to exclude coverage for certain conditions that pre-date the policy's effective date of January 14, 2013, unless those conditions were "fully disclosed in the application and … not specifically excluded from coverage" in the policy.

> Third, the policy includes this "Time Limit on Certain Defenses" provision:

>> After two years from the latter of the Policy Effective Date or its most recent Reinstatement Date, no misstatements, except fraudulent misstatements, made by you or the Owner in the application for the policy shall be used to rescind the policy or to deny a claim for Disability starting after the end of such two-year period.

>> No claim for Disability starting after two years from the latter of the Policy Effective Date or its most recent Reinstatement Date will be reduced or denied on the ground that a disease or physical condition existed before such date, unless it is specifically excluded by name or specific description, or there was fraudulent misstatement in the application for the policy or for reinstatement.

Doc. 35-1 at 24; Doc. 38 at ¶ 70.  Illinois law requires insurers to include this provision (or one even more protective of insureds) in their accident and health policies.  *See* 215 ILCS 5/357.1 ("[E]ach accident and health policy delivered or issued for delivery to any person in this State shall contain the provisions set forth in sections 357.2 through 357.13 in the words in which the same appear in the specified sections … ."), 5/357.3 (the "Time Limit on Certain Defenses" provision).  The provision provides two protections to the insured that go into effect two years after the policy's effective date: (1) Standard cannot rescind the policy or deny a disability claim for any "misstatements" made in the insured's application, other than "fraudulent misstatements"; and (2) Standard cannot reduce or deny a disability claim "on the ground that a disease or physical condition existed" before the policy's effective date, unless that condition is "specifically excluded" in the policy or the insured made a "fraudulent misstatement" in the application.

### F.     VanLanduit's Claim for Disability Benefits

On November 18, 2019, well over two years after the policy's effective date, VanLanduit submitted a disability benefits claim to Standard.  Doc. 40 at p. 27, ¶ 55.  The claim stated that he was no longer able to perform the "physical duties" of his occupation as a golf course superintendent in light of the "muscle loss" he had experienced after being "[d]iagnosed with FSH[D] [m]uscular [d]ystrophy."  Doc. 38 at ¶ 73.

While investigating the claim, Standard discovered records of the FSHD-related treatment and testing that VanLanduit received from Drs. Romeo and Barboi in late 2012 and early 2013.  Doc. 32-16 at 9-10.  Citing those records, Standard sent VanLanduit a letter on January 30, 2020, asking that he provide "an explanation of [his] change in health and the discrepancies between the information [he] provided" in his application materials and the information contained in the records from Drs. Romeo and Barboi.  *Ibid*.

In his reply, VanLanduit asserted, among other things, that at the time he signed the amendment and supplement, he believed that Standard was aware of the treatment he had received from Drs. Romeo and Barboi.  Doc. 40 at p. 30, ¶ 58.  Specifically, VanLanduit stated: "I assumed Standard had all of this information because it came through [Dr. Waxman's] referral and because the policy Standard issued to me contained an exclusion for my shoulder, even though I did not specifically mention anything regarding my shoulder on my initial application." Doc. 32-13 at 2.

Dissatisfied with VanLanduit's response, Standard filed this suit weeks later.  Doc. 40 at p. 33, ¶ 59.

### Discussion

As noted, Standard seeks, in the alternative: (1) a declaratory judgment that the policy is void *ab initio* due to VanLanduit's failure to satisfy conditions precedent to coverage; (2)

rescission of the policy due to the misstatements he made in his application materials; or (3) a declaration that the policy does not cover his disability claim.  Doc. 1 at ¶¶ 27-55.  The parties agree that Illinois law applies, Doc. 32 at 8-16; Doc. 35 at 11-19, so the court will apply Illinois law.  *See McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998) ("Because this is a diversity case, we look to state law to provide the substantive law regarding interpretation of the insurance policy.").

The Seventh Circuit has summarized Illinois law governing the interpretation of insurance policies as follows:

> In Illinois, insurance policies are contracts; the general rules governing the interpretation and construction of contracts govern the interpretation and construction of insurance policies.  Illinois courts aim to ascertain and give effect to the intention of the parties, as expressed in the policy language, so long as doing so does not contravene public policy.  In doing so, they read the policy as a whole and consider the type of insurance purchased, the risks involved, and the overall purpose of the contract.  If the policy language is unambiguous, courts apply it as written.  Policy terms that limit an insurer's liability are liberally construed in favor of coverage, but only when they are ambiguous, or susceptible to more than one reasonable interpretation.

*Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 933 (7th Cir. 2011) (citations omitted).

## I.    Declaratory Judgment That the Policy Is Void *Ab Initio* (Count I)

Standard claims that VanLanduit did not satisfy the conditions precedent for coverage to become effective, thus rendering the policy void *ab initio*.  Doc. 1 at ¶¶ 27-33; Doc. 35 at 11-14; Doc. 39 at 11-13; Doc. 44 at 6-11.  Citing the FSHD-related treatment and testing VanLanduit received from Drs. Romeo and Barboi after submitting his original application but before signing the amendment and supplement, Standard argues that he failed to satisfy two conditions precedent for coverage: (1) that the answers in his application remained "true and complete" by the time the policy was delivered and the first premium was paid, Doc. 35-1 at 41 ("No insurance will be in force until: (a) the date a policy has been issued, delivered to and accepted by the

owner; and (b) the first full premium is paid while all answers in this application remain true and complete."); and (2) that there was at that time "no change in [his] health" from the health information included in his original application, *id.* at 48 ("Coverage will not take effect under the policy unless this form is signed by me and the policyowner, if different, the first full premium is paid, and there has been no change in my health and status of employment or occupation as stated in the application."); *id.* at 46 ("Coverage will not take effect under the policy unless this form is signed by me[,] … the first full premium is paid, and there are no amendments in the answers I have provided in the application other than those listed above."). VanLanduit responds that any failure to comply with those two conditions precedent rendered the policy not void *ab initio*, but merely voidable, *i.e.*, subject to rescission. Doc. 32 at 8-11; Doc. 37 at 10-11; Doc. 43 at 3-4.

Under Illinois law, "[t]he difference between a contract that is void *ab initio* and one that is merely voidable is that a voidable contract can be ratified and enforced by the obligor, although not by the wrongdoer, while the void contract cannot be." *ISBA Mut. Ins. Co. v. Coregis Ins. Co.*, 821 N.E.2d 706, 713 (Ill. App. 2004) (internal quotation marks omitted). "In other words, a contract that is void *ab initio* is treated as though it never existed; neither party can cho[o]se to ratify the contract by simply waiving its right to assert the defect." *Ibid.* By contrast, "if a contract is merely voidable, a party can either opt to void the contract based upon that defect, or choose, instead, to waive that defect and ratify the contract despite it." *Ibid.*

According to Standard, because VanLanduit failed to meet the above-referenced conditions for "insurance [to] be in force" and for "coverage … [to] take effect under the policy," Doc. 35-1 at 41, 46, 48, the policy never existed and is thus void *ab initio.* That conclusion, Standard argues, follows from cases barring an insured from recovering under a

policy when conditions precedent necessary for the policy to take effect have not been satisfied. *See Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Columbian Nat'l Life Ins. Co.*, 76 F.2d 733, 735 (7th Cir. 1935) (holding "that the policy never took effect" because the "application made good health at the time of the payment of the first premium and the delivery of the policy a condition precedent to the valid issuance of the policy" and the insured was no longer in good health when the first premium was paid and the policy was issued); *Mijes v. Primerica Life Ins. Co.*, 740 N.E.2d 1160, 1163-64 (Ill. App. 2000) (holding that the plaintiff "could not recover under [a life insurance] policy" issued to him and his spouse, the decedent, because the decedent "failed to perform a condition precedent" to the policy "becom[ing] effective"); *Kioutas v. Life Ins. Co. of Va.*, 35 F. Supp. 2d 616, 622-23 (N.D. Ill. 1998) (relying on *Continental Illinois* in granting summary judgment to the insurer "for failure of the insured to satisfy the good health condition precedent for policy coverage"); *Fidelity & Guar. Life Ins. Co. v. Payne*, 2003 WL 22143249, at *2 (N.D. Ill. Sept. 16, 2003) ("[B]ecause [the insured's] health was not as stated in th[e] application upon delivery of the [p]olicy, the insurance never took effect.") (internal quotation marks omitted).

The problem for Standard is that none of those cases do precisely what it asks this court to do, which is to bar an insured from pursuing an insurance claim on the ground that the policy was void *ab initio* for failure to satisfy a condition precedent. "Whether a defect in the formation of a contract renders that contract void *ab initio* or merely voidable depends upon the nature of that defect." *Coregis Ins. Co.*, 821 N.E.2d at 712. Certain defects render a contract void *ab initio*. *See Hall v. Montaleone*, 348 N.E.2d 196, 198 (Ill. App. 1976) (stating that "gambling contracts or contracts for an immoral or criminal purpose" are "absolutely void and unenforceable" "by reason of public policy"); *Grassini v. DuPage Twp.*, 665 N.E.2d 860, 864-65

(Ill. App. 1996) (holding that an employment contract was void *ab initio* because the township exceeded its statutory authority in entering into the contract). Other defects render the contract merely voidable. *See Cain v. Cross*, 687 N.E.2d 1141, 1143 (Ill. App. 1997) ("A contract alleged to be invalid on the basis of the statute of frauds is merely voidable, not void. The contract may be enforced unless the defendant sets up the statute as a defense."); *Fletcher v. Marshall*, 632 N.E.2d 1105, 1107 (Ill. App. 1994) ("A contract of a minor is not void *ab initio*, but merely voidable at the election of the minor upon his attaining majority."); *Lyons v. Christ Episcopal Church*, 389 N.E.2d 623, 625 (Ill. App. 1979) ("The general rule with respect to fraudulent misrepresentation in the sale of real estate is that the contract is merely voidable, not void, at the option of the injured party.").

The question here is whether VanLanduit's failure to perform conditions precedent is among the category of defects rendering a contract void *ab initio* ormerely voidable. No case cited by the parties speaks directly to that question. However, a close reading of the cases addressing the impact of an insured's failure to comply with conditions precedent—including the cases cited by Standard—reveals that such failures render a contract voidable, not void *ab initio*. The reason is that those cases recognize the insurer's ability to waive the insured's failure to comply with conditions precedent, which can occur only if the contract is voidable and not if it is void *ab initio*.

For instance, in *Continental Illinois*, the Seventh Circuit held that the insured was not entitled to recover on its claim because "the policy never took effect"—as the condition precedent requiring the insured's employee to be "[in sound health] when the first premium was paid and the policy issued" had not been satisfied—*and* "the [insurance] company never waived this breach of agreement for it never learned of [the insured's] ill health until after he died." 76

13

F.2d at 734-35; *see also Mass. Mut. Life Ins. Co. v. O'Brien*, 5 F.3d 1117, 1122-23 (7th Cir. 1993) (holding that the case presented triable issues as to whether the insurer "waived its right to deny coverage" on the ground that the insured had failed to satisfy conditions precedent to coverage).  To the same effect is *Sulski v. Metropolitan Life Insurance Co.*, 196 Ill. App. 76 (1915), *aff'd sub nom*. *Seaback v. Metro. Life Ins. Co.*, 113 N.E. 862 (Ill. 1916), where in holding that the insurer was not liable under a policy when the insured contracted tuberculosis before the policy was issued, the court explained that the policy stated that "no obligation is assumed by [the insurer] prior to [the date of the policy] … unless on said date the insured is alive and in sound health," and the insurer had not "waived its right to make its defense for a violation of the terms and conditions mentioned, by accepting the premiums paid, after it had notice or knowledge of the matters of defense stated." *Id.* at 78-80.

The recognition in these decisions of the insurer's ability to waive the insured's failure to satisfy a condition precedent to coverage can mean only that the defect rendered the policy voidable, not void *ab initio*.  After all, as noted, a contractual party can waive only those defects that render a policy voidable, not those rendering a policy void *ab initio*.  *See Coregis Ins. Co.*, 821 N.E.2d at 713.  Put another way, if an insured's failure to satisfy a condition precedent rendered the policy void *ab initio*, the insurer "could not waive its right to rescind the policy" because, "legally speaking, the policy never existed." *Ibid*.  Because *Sulski*, *Continental Illinois*, and *O'Brien* contemplate that an insurer in Standard's shoes *can* waive its right to void the contract, it follows that the failure of an insured in VanLanduit's shoes to satisfy a condition precedent does not render the policy void *ab initio*.

The court accordingly agrees with VanLanduit that Standard's *ab initio* claim fails as a matter of Illinois law.  The analysis could stop there, but the court adds for good measure that the

policy sends contradictory signals as to the consequences of an insured's failure to comply with conditions precedent to the policy taking effect. Those contradictory signals are important because, as noted, ambiguities in an insurance policy "must be construed in favor of the insured." *Nat'l Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 361 (7th Cir. 1987) (collecting cases); *see also Medina*, 645 F.3d at 933.

The Standard policy states at certain points that "no insurance will be in force" and "coverage will not take effect" unless the insured satisfies the conditions precedent—including that the insured's answers regarding his medical information remain "true and complete" when the policy is delivered and the first premium is paid, and that there has been "no change in [his] health" from the representations in his original application. Doc. 35-1 at 41, 46, 48. The court will assume without deciding that those provisions are best read to mean that failure to perform the conditions precedent renders the policy void *ab initio*. At another point, however, the policy states that, "if any answers are false, [i]ncorrect[,] or untrue[,] Standard may *have the right to deny benefits or rescind* [VanLanduit's] insurance policy." *Id*. at 41 (emphasis added). That provision conveys that an insured's incorrect or false answers regarding his medical condition will *not* render the policy void *ab initio* because, as explained, an insurer's ability to decide whether to deny benefits or rescind a policy presumes the existence of a valid policy and is therefore incompatible with a policy that is void *ab initio*. *See Penn Mut. Life Ins. Co. v. Greatbanc Tr. Co.*, 887 F. Supp. 2d 822, 828 (N.D. Ill. 2012) ("Under Illinois law, 'the remedy of rescission presumes that a valid contract exists; it does not negate that a contract ever existed.'") (quoting *Allianz Ins. Co. v. Guidant Corp.*, 869 N.E.2d 1042, 1062 (Ill. App. 2007)).

Accordingly, certain provisions of the Standard policy (perhaps) convey that an insured's failure to comply with conditions precedent renders the policy void *ab initio*, while another

15

provision conveys that such a failure merely renders the policy voidable. That conflict must be resolved in VanLanduit's favor, as Illinois law requires that "inconsistent provisions" in a policy be interpreted in the insured's favor. *Barlow v. State Farm Mut. Auto. Ins. Co.*, 127 N.E.3d 754, 760 (Ill. App. 2018); *accord Yates v. Farmers Auto. Ins. Ass'n*, 724 N.E.2d 1042, 1045 (Ill. App. 2000). All this stands to confirm the conclusion reached above, that the Standard policy is voidable, not void *ab initio*, due to any failure by VanLanduit to satisfy its conditions precedent. *See Karaganis*, 811 F.2d at 361; *see also Wood v. Valley Forge Life Ins. Co.*, 478 F.3d 941, 944 (8th Cir. 2007) (Arkansas law) (rejecting the insurer's argument that the insured's misstatement in the policy application rendered the policy void *ab initio* for failure to comply with a condition precedent—*i.e.*, that "insurance will not take effect until the policy is delivered while … conditions remain as described in this application"—because that provision conflicted with another provision stating that "any material misstatement in this declaration, or elsewhere in this application, will render the policy, if issued, *voidable*").

In sum, VanLanduit is correct that the policy is merely voidable, and not void *ab initio*, for failure to comply with its conditions precedent. VanLanduit is therefore entitled to summary judgment on Standard's claim for a declaration that the policy is void *ab initio*.

## II. Rescission Claim (Count II)

Standard seeks in the alternative rescission of the policy due to what it alleges are fraudulent misstatements made by VanLanduit in his application. Doc. 1 at ¶¶ 34-38. As a threshold matter, VanLanduit argues that Standard waived its right to rescind the policy by failing to investigate, within two years of the policy coming into force, whether his application materials misrepresented his health. Doc. 32 at 14-16; Doc. 37 at 9; Doc. 43 at 2-3. That argument fails. True, if a policy contains "an incontestability clause" providing that the "statements contained in the application" are "incontestable" after two years, the insurer is

"oblig[ed] … to investigate the insured's medical history promptly else it become bound by representations contained on the insured's application." *Equitable Life Assur. Soc. of U.S. v. Bell*, 27 F.3d 1274, 1278-79 (7th Cir. 1994) (Indiana law). But the policy here does not include an incontestability clause, so VanLanduit cannot rely on that rule.

Turning to the merits, Standard argues that rescission is warranted under Section 154 of the Illinois Insurance Code, 215 ILCS 5/154, or under the policy's Time Limit on Certain Defenses provision. Doc. 35 at 15-18; Doc. 39 at 13-19; Doc. 44 at 11-18. VanLanduit responds that the Time Limit on Certain Defenses provision in fact operates as an "express waiver" of Standard's right to rescind the policy for any reason other than those stated in that provision. Doc. 32 at 3, 11; Doc. 37 at 8-9. VanLanduit is correct, and understanding why requires examining Section 154 in some detail.

Section 154 "limit[s] an insurer's right to rescind a policy based upon an insured's misstatement." *Coregis Ins. Co.*, 821 N.E.2d at 714. It provides in relevant part:

> No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance … shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company.

215 ILCS 5/154.

The Supreme Court of Illinois has interpreted Section 154 to set forth "a two-prong test for determining if [a] policy may be rescinded": "First, the [insured's] statement must be false, and second, it either must have been made with an actual intent to deceive or must materially affect the acceptance of the risk or hazard assumed by the insurer." *ISBA Mut. Ins. Co. v. Law Off. of Tuzzolino & Terpinas*, 27 N.E.3d 67, 71 (Ill. 2015) (internal quotation marks omitted); *see*

*also TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630, 635 (7th Cir. 2003). The second part of the test is "in the disjunctive," meaning that "either an actual intent to deceive *or* a material misrepresentation which affects either the acceptance of the risk or the hazard to be assumed can defeat or avoid the policy." *Nat'l Boulevard Bank v. Georgetown Life Ins. Co.*, 472 N.E.2d 80, 86 (Ill. App. 1984).

"Given that the purpose behind section 154 is to protect insureds from insurance companies seeking to void their policies, the statute does not prevent insurance companies from giving their insureds even more protection." *Karaganis*, 811 F.2d at 363; *accord Golden Rule Ins. Co. v. Schwartz*, 786 N.E.2d 1010, 1015 (Ill. 2003). Thus, where a policy includes a provision that is "more favorable to the insured than is required by the statute," the policy provision rather than Section 154 controls. *Karaganis*, 811 F.2d at 362-63. By contrast, if a policy provision purports to provide less protection than that required by Section 154, the "provision is contrary to public policy and therefore invalid." *Id.* at 362; *see also State Farm Ins. Co. v. Am. Serv. Ins. Co.*, 773 N.E.2d 666, 673 (Ill. App. 2002) (holding that Section 154 "super[s]ede[d]" a policy provision "purport[ing] to grant [the insurer] the power to avoid the insurance policy for reasons other than those outlined in section 154"). Section 154 thus operates as a floor, not a ceiling, on the protections an insurer may provide an insured concerning misstatements an insured makes in a policy application.

The policy's Time Limit on Certain Defenses provision provides the insured with more protection than Section 154 requires by waiving Standard's right—which Section 154 otherwise would give it—to rescind the policy after two years for material misstatements made without an actual intent to deceive. As noted, Section 154 allows Standard to void the policy based on *either* a misstatement made with "actual intent to deceive" *or* a "material" misstatement. *Nat'l*

*Boulevard Bank*, 472 N.E.2d at 86.  But the Time Limit on Certain Defenses provision states that, "[a]fter two years from the … Policy['s] Effective Date," Standard may void the policy for a "misstatement[]" in the insured's application *only* if it was a "fraudulent misstatement[]."  Doc. 35-1 at 24.  And given the floor set by Section 154, the "fraudulent misstatement[]" giving rise to Standard's right to void the policy must be "made with actual intent to deceive."  215 ILCS 5/154; *see Metro. Life Ins. Co. v. Robinson*, 2007 WL 2461658, at *5 (N.D. Ill. Aug. 27, 2007) (interpreting an analogous Time Limit on Certain Defenses provision against the backdrop of Section 154 and reasoning that, once the "policy has been in force for more than two years, only misrepresentations made with the intent to deceive can void the policy").  Therefore, because the policy had been in force for more than two years when Standard sought rescission, Standard may obtain rescission only if VanLanduit made a misrepresentation in his policy application with an actual intent to deceive.

VanLanduit indisputably made misstatements in his application by failing to reference in the supplement and amendment the treatment he received from Drs. Romeo and Barboi.  *See Golden Rule Ins. Co.*, 786 N.E.2d at 1016-17 (noting that Section 154 imposes a "rigid standard of accuracy" on an insured's statements in a policy application, with accuracy assessed based solely on the statements' "truth or falsity") (internal quotation marks omitted).  As noted, in the original application he submitted on October 24, 2012, VanLanduit represented that: (i) in the last 10 years, he had not "had, been told [he] had, been treated or seen by a medical practitioner for, or been diagnosed as having" any disease or disorder of the muscles other than his strained lower back muscle; (ii) he had not seen any physician for the past 5 years other than for a strained lower back muscle in June 2012; (iii) he had not had any medical procedure, blood test or other test in the past 5 years; (iv) he had not been advised in the last 5 years to have any

medical test that had not been completed; and (v) he had not had any condition or symptoms in the past 3 years that had not been treated or diagnosed. Doc. 35-1 at 39-40. But between October 24, 2012 and January 14, 2013, when he signed the amendment and supplement and his policy was delivered, VanLanduit underwent extensive medical evaluation for FSHD, a form of muscular dystrophy, that rendered each of those representations objectively untrue. Specifically, on December 12, Dr. Romeo discussed with VanLanduit the possibility of his having a type of muscular dystrophy; on December 20, Dr. Barboi performed EMG and NCS testing that showed evidence for a chronic muscular disorder; and on January 10, his blood was drawn to perform a diagnostic test for FSHD. Doc. 38 at ¶¶ 14, 17, 23, 25. And yet VanLanduit did not disclose those matters in the supplement and amendment he signed on January 14, and in fact inaccurately stated that "[a]ll answers recorded in the application and in th[e] amendment remain[ed] true and complete," that he had not "consulted with or been treated by a physician or other medical practitioner" since completing the application, and that he had not "experienced any sickness, injury or change in health." Doc. 35-1 at 46, 48.

Although VanLanduit indisputably made misstatements in his application materials, the record presents a genuine dispute over whether he did so with "actual intent to deceive." 215 ILCS 5/154. VanLanduit submits that he had a "good faith belief" on January 14, when he signed the application amendment and supplement and Standard delivered the policy, that Standard knew about his treatment with Drs. Barboi and Romeo. Doc. 32 at 13; Doc. 37 at 2-7; Doc. 43 at 2. VanLanduit's submission rests on his testimony that, in light of the policy exclusion imposed by Standard for disability caused by injury to, disease, or disorder of the right shoulder, he believed that Standard "had access to [his] medical records" from Drs. Barboi and Romero and thus was "aware of what was going on [with his treatment,] and that's why the

exclusion for the shoulder was put in." Doc. 32-4 at 16 (61:10-24). That is, according to

VanLanduit, he did not think that he was "concealing information from Standard" given his view

that Standard already had that very information. *Id.* at 27 (105:14-17). Standard responds that

VanLanduit "actively concealed" his medical evaluations for FSHD, and that his supposed belief

that Standard knew about those evaluations is not "plausible" in part because it notified him that

the addition of the shoulder exclusion to the policy was based on records obtained from Drs.

Waxman and Elvove and made no mention of Drs. Romeo and Barboi. Doc. 39 at 5, 16; Doc.

35-10 at 2.

On this record, the question whether VanLanduit had an actual intent to deceive Standard

cannot be resolved on summary judgment. "The existence of an actual intent to deceive [in

making a false representation in an application for insurance] is ordinarily a fact question" to be

resolved by the trier of fact. *Ehret v. Loyal Protective Life Ins. Co.*, 251 N.E.2d 101, 104 (Ill.

App. 1969); *accord Fitzgerald v. MFA Mut. Ins. Co.*, 481 N.E.2d 754, 756 (Ill. App. 1985); *see

also Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis.,

Inc.*, 991 F.2d 1249, 1258 (7th Cir. 1993) ("Due to the difficulty of proving a subjective state of

mind, cases involving motivation and intent are usually not appropriate for summary

judgment."); *P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th Cir. 1986) (noting that,

"as a general principle, questions of motive and intent are particularly inappropriate for summary

adjudication and that resolution by summary judgment of the issues raised by an allegation of

fraud is often difficult or impossible") (internal quotation marks and citations omitted). There is

especially good reason to follow the general rule where, as here, evaluating whether a party had

an "actual intent to deceive" requires credibility determinations. *See Omnicare, Inc. v.

UnitedHealth Group, Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) ("[D]istrict courts presiding

over summary judgment proceedings may not weigh conflicting evidence, or make credibility determinations, both of which are the province of the jury.") (internal quotation marks and citations omitted); *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995) (noting that, where the resolution of the plaintiff's claim depends on whether certain testimony should be believed, "[the] credibility judgment is best left to the finder of fact").

In the end, neither side is entitled to summary judgment on the rescission claim because there is a genuine factual dispute as to whether VanLanduit made the misstatements in his application materials fraudulently, meaning with actual intent to deceive.

## III.  Declaratory Judgment That There Is No Coverage (Count III)

In the alternative to its first two claims, Standard seeks a declaration that the policy does not provide coverage for VanLanduit's disability claim. Doc. 1 at ¶¶ 39-55; Doc. 35 at 18-19; Doc. 44 at 18-19. Standard submits that VanLanduit's FSHD falls outside the policy's definition of a "Sickness" because the condition did not "first manifest[] itself after the Policy Effective Date," Doc. 35-1 at 29—January 14, 2013—but rather did so at least a month earlier. Standard likewise argues that the policy's Pre-existing Conditions provision defeats coverage because VanLanduit's "Disability [was] caused by or result[ed] from a Pre-existing Condition," FSHD, which was not "fully disclosed in the application and … not specifically excluded from coverage by amendment or endorsement." *Id.* at 16-17.

Even assuming that Standard's factual premises—that VanLanduit's FSHD first manifested before the policy's effective date, and that the FSHD was an undisclosed pre-existing condition—are correct, its invocation of the "Sickness" definition and Pre-existing Conditions provision is defeated by the policy's Time Limit on Certain Defenses provision, which, as noted, Illinois law required Standard to include. *See* 215 ILCS 5/357.1, .3. The Time Limit on Certain Defenses provision, in pertinent part, forbids Standard from "reduc[ing] or den[ying]" a "claim

22

for Disability" two years after the policy's effective date "on the ground that a disease or physical condition existed before such date, *unless it is specifically excluded by name or specific description, or there was fraudulent misstatement in the application for the policy or for reinstatement*." Doc. 35-1 at 24 (emphasis added). The policy does not "specifically exclude[]" FSHD "by name or specific description." And, as shown above, there is a genuine fact dispute on the question whether VanLanduit's failure to reference in his amendment and supplement the FSHD-related treatment he received from Drs. Romero and Barboi was a "fraudulent misstatement." Accordingly, because the policy had been in force for more than two years when Standard denied his claim and filed this suit, the Time Limit on Certain Defenses provision precludes Standard—at least at this juncture, where there are genuine fact disputes over whether his misstatements were fraudulent—from denying his disability claim pursuant to the policy's "Sickness" definition and the Pre-existing Conditions provision on the ground that his FSHD existed or manifested before the policy's effective date. *See Karaganis*, 811 F.2d at 361.

This result is in accord with *Equitable Life Assurance Society of United States v. Bell*, *supra*. The insurer in *Bell* sought a declaration that the policy did not cover its insured's multiple sclerosis because (1) the policy's definition of "Sickness" encompassed only those diseases "first manifest[ing] … while the policy is in force" and (2) the policy issued after the insured was diagnosed with the disease. 27 F.3d at 1276-78. The Seventh Circuit held that the insurer's invocation of the "Sickness" provision was defeated by a policy provision, required by Indiana law, stating that after the policy had been in force for two years, a claim for benefits could not be denied on the ground that the underlying "disease or physical condition had existed prior to the effective date of coverage under th[e] policy, unless, effective on the date of the loss, such

23

disease or physical condition was excluded from coverage by name or specific description." *Id.*
at 1276, 1280-83.  As the Seventh Circuit explained:

> Th[e] provision states in no uncertain terms that after two years, no disability
> claim shall be denied on the ground that the underlying disease or condition
> "existed" before the policy became effective. … [T]he term "exist" in its
> ordinary sense refers broadly to a state of being, without reservation as to
> other qualities, including manifestation.  Thus, in the absence of any
> clarification in the clause, we believe it is most naturally understood to
> include any pre-existing disease or condition, regardless of whether it
> manifested prior to the policy date. … To insert into the clause a limitation to
> a disease or condition which existed but did not manifest prior to the effective
> date of the policy would be to evade the mandate of the legislature, and that
> we cannot sustain.

*Id.* at 1281-82.

That reasoning applies with equal force here: Illinois law bars Standard from "reduc[ing]
or den[ying]" a claim for "disability" two years after the policy's issuance "on the ground that a
disease or physical condition not excluded from coverage by name or specific description
effective on the date of loss had existed prior to the effective date of coverage of th[e] policy,"
215 ILCS 5/357.3, and required Standard to include that provision in its policy, *see* 215 ILCS
5/357.1.  Standard cannot evade that prohibition by relying on policy provisions that purport to
exclude pre-existing conditions from the scope of the policy.  *See Bell*, 27 F.3d at 1281-82;
*Karaganis*, 811 F.2d at 362 ("[Under Illinois law,] [a] contract provision is contrary to public
policy and therefore invalid if it 'dilute[s] or diminish[es] statutory provisions applicable to [the
insurer's] contract of insurance.'") (quoting *DC Elecs., Inc. v. Emp'rs Modern Life Co.*, 413
N.E.2d 23, 28 (Ill. App. 1980)); *see also State Farm Ins. Co.*, 773 N.E.2d at 673.  Therefore,
given the material fact dispute over whether VanLanduit's misstatements were fraudulent,
Standard is not entitled to summary judgment on its coverage claim.  That fact dispute likewise
precludes summary judgment for VanLanduit on that claim.

**Conclusion**

Standard's summary judgment motion is denied.  VanLanduit's summary judgment motion is granted as to Standard's claim for a declaration that the policy is void *ab initio*, and denied as to Standard's rescission claim and claim for a declaration that there is no coverage. The rescission and coverage claims must be tried.

July 29, 2021

_____
United States District Judge

25